UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20400-CR-UNGARO/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RUEL ELLIS and
JHENELLE LEWIS,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the Joint Motion to Suppress Evidence (DE# 33, 9/6/19) filed by defendants Ruel Ellis and Jhenelle Lewis (collectively, "defendants"). This motion was referred to United States Magistrate Judge John J. O'Sullivan by the Honorable Ursula Ungaro, United States District Court Judge for the Southern District of Florida. See Order of Reference to Magistrate Judge (DE# 38, 9/11/19). Having reviewed the applicable filings and the law and having held an evidentiary hearing on October 8, 2019, it is respectfully RECOMMENDED that the Joint Motion to Suppress Evidence (DE# 33, 9/6/19) be **DENIED** for the reasons stated herein.

## BACKGROUND

The defendants are charged by indictment in the Southern District of Florida with conspiracy to import cocaine in violation of Title 21, United States Code, Section 963 (Count I), importation of cocaine in violation of Title 21, United States Code, Section 952(a) (Count II), conspiracy to possess with the intent to distribute cocaine in violation

of Title 21, United States Code, Section 846 (Count III) and possession with the intent to distribute cocaine in violation of Title 21, United States Code, Section 841(a)(1) (Count IV). See Indictment (DE # 17, 6/28/19).

On September 6, 2019, the defendants filed a Joint Motion to Suppress Evidence (DE# 33, 9/6/19) (hereinafter "Motion"). The government filed its response on September 20, 2019. See Amended Government's Response to Defendants' Joint Motion to Suppress (DE# 46, 9/20/19) (hereinafter "Response"). The defendants filed their reply on September 27, 2019. See Reply to Amended Government's Response to Defendants' Joint Motion to Suppress Evidence (hereinafter "Reply").

On October 8, 2019, the undersigned held an evidentiary hearing on the instant motion. The undersigned admitted into evidence the Government's Exhibits 1 through 8 and the Defendants' Exhibits A and B. The government presented the testimony of United States Customs and Border Protection (hereinafter "CBP") Officer Fredy Hidalgo. The defendants did not call any witnesses.

This matter is ripe for adjudication.

## **FINDINGS OF FACT**

CBP Officer Fredy Hidalgo has worked for the Department of Homeland Security for approximately 12 years. During the past, approximately four years, Officer Hidalgo has worked in the Passenger Analytical Unit. As part of his job, Officer Hidalgo has received specialized training in the field of narcotics trafficking. Officer Hidalgo has also been trained in systems access, vetting, targeting and interviewing techniques.

Officer Hidalgo's job duties include conducting routine cabin searches of

2

suspected violators. Officer Hidalgo identifies suspected violators by reviewing ship manifests of crew members and passengers to identify individuals who may pose threats to the United States, including narcotics threats. He reviews information from various sources including intelligence analysis, trends and news articles to identify patterns used by suspected narcotics violators.

**A.      Pre-Search Investigation**

On June 15, 2019, the MSC Seaside cruise ship docked at the Port of Miami following a multi-day cruise. The MSC Seaside was coming from Nassau, Bahamas. Prior to that, the ship had docked in ports in Puerto Rico, St. Thomas and St. Martin. Each one of these places are countries or territories known for narcotics trafficking.

The defendants had booked cabin 14204 on the MSC Seaside. Officer Hidalgo selected cabin 14204 for a routine cabin search for a number of reasons.[1] Officer Hidalgo noted that the defendants had a late booking, meaning the defendants had booked their cruise approximately 15 days before the sailing date. Officer Hidalgo explained that late bookings were considered suspicious because people generally book cruises approximately two months or more ahead of the sailing date, especially people who are traveling from out of state.[2] Based on information reviewed by Officer

---

[1] Officer Hidalgo's report lists three reasons why he selected cabin 14204 for a routine cabin search: late booking, criminal history and travel to source countries. At the evidentiary hearing, Officer Hidalgo testified to additional reasons why he selected this cabin as summarized in this Report and Recommendation.

[2] Ms. Lewis' driver's license listed her address as being in Paterson, New Jersey. Mr. Ellis' driver's license showed he resided in Port St. Lucie, Florida. See Government's

3

Hidalgo, people engaged in narcotics trafficking tend to have late bookings when it comes to air and sea travel.

Officer Hidalgo also noted that the defendants did not fit the profile of the average MSC passenger. The average MSC passenger was a European, approximately 55 years or older. The defendants were United States citizens who were approximately thirty-years old.

Additionally, the defendants both had criminal histories. Ms. Lewis had a 2017 arrest for marijuana possession. She had also been arrested four times in 2010, including one arrest for possession with intent to distribute a controlled substance. Mr. Ellis had a prior arrest for marijuana possession and simple assault in 2015 and a controlled substance arrest in 2009.

Officer Hidalgo also took into account the defendants' travel history. Mr. Ellis had traveled to Jamaica four times in 2018. Jamaica is a source country known for narcotics trafficking. Officer Hidalgo also noted that other than a prior, attempted trip to Jamaica,[3] Mr. Ellis and Ms. Lewis had not traveled together in the past.

Officer Hidalgo also considered the defendants' residences. Officer Hidalgo believed the fact that the defendants did not live together was a relevant factor. According to Officer Hidalgo, it was unusual for unmarried persons who did not live

---

Exhibit 7.

[3] Mr. Ellis had made travel plans with Ms. Lewis to go to Jamaica on one prior occasion, but records indicated that they did not board the airplane.

4

together to have late cruise bookings. Moreover, Officer Hidalgo determined that Paterson, New Jersey, where Ms. Lewis was residing, was a high crime area.

Officer Hidalgo took into account all of these factors in selecting cabin 14204 for inspection.

**B.    Search of the Defendants' Cabin**

On the morning of June 15, 2019, Officer Hidalgo emailed the MSC security team and asked that any luggage pertaining to cabin 14204 be isolated.[4] Officer

---

[4] Officer Hidalgo denied instructing the MSC security team to prohibit the defendants from leaving the ship until their luggage and cabin had been inspected. However, Officer Hidalgo also testified that on the morning of a search, it is routine for CBP to "block" people of interest in the system until CBP has conducted an inspection. The defendants introduced into evidence a security incident report prepared by the MSC security team which stated "as per the CBP instructions, [t]he guests shall not leave the vessel on the 15th before cabin and luggage inspections by the CBP personnel." Defendant's Exhibit B. At issue before the Court is whether law enforcement officers needed reasonable suspicion before searching the defendants' cabin and, if so, whether there was reasonable suspicion in this case. Thus, whether or not CBP officers instructed MSC security personnel to prohibit the defendants from leaving the vessel is not relevant to the issues before the Court.

To the extent the defendants are relying on the MSC security incident report to impeach Officer Hidalgo's credibility, the undersigned notes that the MSC security incident report is a summary of what MSC security personnel believed was communicated to them by CPB. The security incident report does not specifically reference Officer Hidalgo and does not identify the CPB officer(s) who provided this instruction. No emails or other communications between Officer Hidalgo and MSC security personnel have been introduced into evidence. The undersigned had an opportunity to observe Officer Hidalgo at the evidentiary hearing and finds him to be a credible witness. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.'").

5

Hidalgo later met with the MSC security chief. Officer Hidalgo, five law enforcement officers, two security personnel and a K-9 dog proceed to cabin 14204.

An officer knocked on the door of the cabin. Ms. Lewis opened the door. The officers introduced themselves as CBP officers conducting routine inspections. None of the officers had their guns drawn. At that point, the officers detected the smell of marijuana emanating from the cabin.[5]

Law enforcement officers asked Ms. Lewis how many people were in the cabin. Ms. Lewis responded that there were two people in the cabin. She opened the door further and law enforcement officers saw Mr. Ellis. Law enforcement officers instructed Ms. Lewis and Mr. Ellis to gather their travel documents and step outside of the cabin. Ms. Lewis and Mr. Ellis complied with these instructions. Law enforcement officers allowed Ms. Lewis and Mr. Ellis to return to the cabin to retrieve their money.

Once Ms. Lewis and Mr. Ellis were outside the cabin, law enforcement officers used a K-9 dog to search the cabin. The dog alerted to two backpacks and a purse as containing possible narcotics. After obtaining a positive alert, law enforcement officers searched the entire cabin.

A part of the key fob pad was snapped off. The officers did not intentionally remove a portion of the key fob pad. As the officers were leaving the cabin to take the defendants to secondary inspection, one of the officers' guns may have hit the key fob pad on the door, knocking part of the key fob pad off the door.

---

[5] Law enforcement officers found marijuana inside a purse in a suitcase. They also

The government has no surveillance videos of the CBP officers' interactions with the defendants on the morning of June 15, 2019. Officer Hidalgo did not ask MSC security personnel for video outside cabin 14204 because he was not aware that there was a camera in the hallway across from cabin 14204.

## ANALYSIS

The search in the instant case took place at the functional equivalent of the border. See United States v. Moreno, 778 F.2d 719, 721 (11th Cir. 1985) (describing the "functional equivalent of the border" as "including the point where a ship first docks in [the United States] after entering [United States'] territorial waters from abroad."). Prior to docking at the Port of Miami, the MSC Seaside had been in the Bahamas. Thus, the MSC Seaside first docked in the United States at the Port of Miami on the morning of June 15, 2019 after coming from a foreign destination. Therefore, the MSC Seaside was at the functional equivalent of the border when CBP officers conducted a search of cabin 14204.

Border searches are not subject to normal warrant requirements and probable cause standards. United States v. Vega-Barvo, 729 F.2d 1341, 1344 (11th Cir. 1984). The Eleven Circuit has explained that:

> At the border, an individual has a lesser expectation of privacy, the government has a greater interest in searching, and the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government . . . . The United States' paramount interest in conducting searches at its borders is national self-protection. . . . Because of the United States' strong interest in national

---

found marijuana residue inside a grinder.

>   self-protection, "[r]outine searches of the persons and effects of entrants
>   are not subject to any requirement of reasonable suspicion, probable
>   cause, or warrant."

United States v. Alfaro-Moncada, 607 F.3d 720, 728 (11th Cir. 2010) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).

Courts employ a two-step process in analyzing border searches. "The first step is to determine if the search was authorized by statute . . . and, if so, the second step is to decide if the search was reasonable under the Fourth Amendment." United States v. Alfaro-Moncada, 607 F.3d 720, 726 (11th Cir. 2010) (citing United States v. Ramsey, 431 U.S. 606, 611-16 (1977)). Here, CBP officers were authorized pursuant to Title 19, United States Code, Sections 1467 and 1581 to conduct searches of vessels in territorial waters. Thus, the first step of the two-step process is satisfied here. At issue, in the instant case is the second step which requires the Court to determine whether the officers' search of the defendants' cabin was reasonable under the Fourth Amendment.

### A.   Border Searches

The government notes that "[g]eneral border searches, including secondary Customs searches, do not require any suspicion of illegal activity." Response at 4. The government therefore argues that no reasonable suspicion was required to search the defendants' cabin.

The government relies on United States v. Alfaro-Moncada, 607 F.3d 720 (11th Cir. 2010). Response at 5. The issue in Alfaro-Moncada was "whether a search without reasonable suspicion of a crew member's living quarters on a foreign cargo vessel that is entering this country is unreasonable for Fourth Amendment purposes." Id. at 727

8

(11th Cir. 2010). The Eleventh Circuit held that "the suspicionless search of [a crew member]'s cabin on . . . a foreign cargo ship . . . while it was docked . . . on the Miami River, was not a violation of the Fourth Amendment." Id. at 732. In reaching this conclusion, the Eleventh Circuit balanced the United States' strong interest in national self-protection against the crew member's privacy interest. The Eleventh Circuit found that:

> Given the dangers we face, the paramount national interest in conducting border searches to protect this nation and its people makes it unreasonable to require any level of suspicion to search any part of a foreign cargo vessel coming into this country. Crew members' cabins are no exception because, like any other part of a vessel, they can be used to smuggle in weapons of mass destruction, illegal devices, or other contraband.

Id. at 731.

The defendants argue that Alfaro-Moncada is distinguishable from the instant case because the defendants here were cruise ship passengers, not crew members on a foreign cargo ship. Reply at 2. The defendants note that the Third Circuit has "determined that the search of a passenger's cabin is sufficiently intrusive to make it a non-routine search that requires reasonable suspicion." Id. (citing United States v. Whitted, 541 F.3d 480 (3d Cir. 2008)). Although some courts have found that reasonable suspicion is required to search a cruise passenger's cabin, these opinions are not binding on the Court.

This Court should find that no reasonable suspicion was required to search a cruise ship passenger's cabin. The instant case is analogous to the Eleventh Circuit's decision in Alfaro-Moncada. The fact that Alfaro-Moncada involved a crew member on

9

a foreign cargo vessel and the instant case involves cruise passengers should not result in a different outcome because the balancing of interests is the same.

The government's interest in protecting the public from smuggled narcotics is just as strong in the instant case as in Alfaro-Moncada. The United States' strong interest in national self-protection is the same whether the vessel at issue is a foreign cargo vessel or a cruise ship. In Alfaro-Moncada, the Eleventh Circuit observed that:

> A home in a fixed location within the United States cannot be used as a means to transport into this country contraband or weapons of mass destruction that threaten national security. A crew member's cabin, like the rest of the ship on which it is located, can and does pose that threat.

607 F.3d at 730. A passenger's cabin on a cruise ship can similarly be used as a means to transport into the United States narcotics or other contraband which pose a threat to national self-protection. See United States v. Berry, 670 F.2d 583, 594-95 (5th Cir. 1982) (en banc) (noting that "the interest of the government in terminating drug smuggling is . . . very substantial. The toll on our society in lives made wretched, in costs to citizens, and in profits of gross size funnelled to the most odious criminals, is staggering."). The government has a substantial interest in preventing illegal substances from entering the country.

The defendants' privacy interest is the same or less compelling than a crew member's privacy interest in his or her cabin. The undersigned finds little distinction between a crew members' cabin and the cabin assigned to a passenger on a cruise ship for purposes of engaging in a Fourth Amendment balancing test. Arguably, a crew member would have a greater expectation of privacy in his or her cabin because that crew member resides in that cabin for a period of months, sometimes in excess of a

year. Whereas a cruise ship passenger, generally uses his or her cabin temporarily for a period of days or weeks. Here, on the day of the search, the defendants were in the process of vacating their cabin because the cruise had ended.[6] Thus, the defendants were in the process of preparing to leave the cabin for good, whereas the crew member in <u>Alfaro-Moncada</u> was residing in the cabin at the time of the search.

In <u>United States v. Williams</u>, 419 F. App'x 902, 903-04 (11th Cir. 2011), the Eleventh Circuit, in an unpublished decision, affirmed the drug trafficking conviction of a cruise ship passenger, noting that because "[the defendant]'s cabin was searched by a Customs officer on a vessel at a port of entry—a functional equivalent of the border—

---

[6] At the evidentiary hearing, the defendants argued that reasonable suspicion was required to search a cruise passenger's cabin because a passenger was expected to leave their cabin at the end of their cruise and law enforcement officers would have the opportunity to search the passenger and/or the passenger's luggage when the passenger made his or her way out of the ship or search the cabin once the passenger had left. Whereas in the case of a crew member, reasonable suspicion was not required to search a cabin because a crew member could remain in the cabin and did not have to go ashore.

The undersigned does not find this argument persuasive. In essence, the defendants are arguing that CBP officers could have used less intrusive means to conduct their investigation. The balancing test under the second step of the two-step test weighs the government's security interest against an individual's right to privacy. It does not ask the Court to consider whether the government could have conducted the search in a less intrusive manner. The Supreme "Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls</u>, 536 U.S. 822, 837 (2002) (quoting <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 556-557, n. 12 (1976)). Thus, the fact that CBP officers could have waited until the defendants left the cabin to search the defendants, the defendants' luggage and/or the empty cabin, does not alter the undersigned's conclusion that no reasonable suspicion

11

the officer did not need reasonable suspicion to conduct the search, and the district court correctly denied [the defendant]'s motion to suppress." Id. at 904. Although Wiliams is an unpublished decision, the undersigned nonetheless finds it persuasive. See United States v. Riley, 706 F. App'x 956, 963 (11th Cir. 2017) (noting that "Eleventh Circuit Rule 36-2 provides that unpublished opinions are not considered binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2. Unpublished opinions are persuasive only insofar as their legal analysis warrants.").

For these reasons, the Court should conclude that a suspicionless search of a cruise passenger's cabin at the functional equivalent of the border does not violate the Fourth Amendment.

**B.     Reasonable Suspicion**

Alternatively, the government argues that CBP officers had reasonable suspicion to search the defendants' cabin. See Response at 10-11.

A person may be briefly detained by law enforcement for investigative purposes only if the officer "has a reasonable suspicion supported by articulable facts" that the person has engaged in or is about to engage in criminal activity. The investigator must "be able to point to specific and articulate facts which, if taken together with rational inferences from these facts, reasonably warrant the intrusion." Terry v. Ohio, 392 U.S. 1 (1968). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1 (1989), and from the collective knowledge of the

---

was required.

officers involved in the stop. United States v. Cotton, 721 U.S. 350, 352 (11th Cir. 1983), cert. den. 465 U.S. 1108 (1984).

The government has the burden of proving reasonable suspicion by a preponderance of the evidence. United States v. Salzano, 158 F.3d 1107, 1115 (10th Cir. 1998). Although reasonable suspicion is considerably less demanding than probable cause, the Fourth Amendment nevertheless requires that law enforcement officers articulate facts which provide some minimal, objective justification for the stop. Sokolow, 109 U.S. at 1585. Such facts may be derived from "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." United States v. Cortez, 449 U.S. 411, 418 (1981).

In the instant case, the government has shown that the CBP officers had reasonable suspicion to search the defendants' cabin. At the outset, the undersigned notes that the CBP officers were not required to have reasonable suspicion in order to knock on the cabin door and initiate a conversation with Ms. Lewis. "A consensual encounter —a police-citizen exchange involving no coercion or detention—does not implicate the Fourth Amendment." United States v. Reddick, 714 F. App'x 938 (11th Cir. 2017). Courts consider a number of factors in determining whether an encounter is consensual including:

> if an individual's path is blocked; if an individual's identification is retained by the police; the individual's age, education, and intelligence; the length of the detention and questioning; the number of officers present; any display of weapons; any physical force or touching; and the tone and language used by the police.

Id. at 938-40 (11th Cir. 2017). Here, CBP officers knocked on the cabin door and introduced themselves as CBP officers conducting routine inspections. Although there were numerous officers present, there was no show of force and none of the officers had their guns drawn.

After Ms. Lewis opened the cabin door and the officers detected the scent of marijuana, the officers had reasonable suspicion (and/or probable cause) to search the cabin for drugs.

Even without the smell of marijuana, CBP officers had reasonable suspicion to search the defendants' cabin at the functional equivalent of the border. Prior to the search, CBP officers knew that the defendants had booked their cruise late, had visited numerous source countries on their cruise, Mr. Ellis had gone to Jamaica (a source country) four times in one year, both defendants had prior arrests for marijuana possession and Ms. Lewis had a prior arrest for possession with intent to distribute a controlled substance. Based on a totality of the circumstances, CBP officers had reasonable suspicion to search the defendants' cabin at the functional equivalent of the border. See United States v. Whitted, 541 F.3d 480, 490 (3d Cir. 2008) (finding that law enforcement agents had reasonable suspicion to search a cruise passenger's cabin where the defendant "took a cruise that traveled to drug source countries," "had previously traveled to several known narcotics source countries," "purchased his ticket just prior to the ship's date of departure and may have paid for it in cash," "had a record of felony drug convictions" and "authorities in San Juan, Puerto Rico had found [the defendant]'s behavior suspicious and entered a lookout for him into [a government]

14

database" which "could have indicated a warrant for [the defendant's] arrest or other criminal wrongdoing.").

Because CBP officers had reasonable suspicion in the instant case, their search of the defendants' cabin at the functional equivalent of the border did not violate the Fourth Amendment.

## RECOMMENDATION

For the foregoing reasons, the undersigned respectfully RECOMMENDS that the Joint Motion to Suppress Evidence (DE# 33, 9/6/19) be **DENIED**.

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Ursula Ungaro, United States District Judge. Any objections to this Report and Recommendation must be filed with a copy of the suppression hearing transcript. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED in Chambers, at Miami, Florida, this 15 day of October, 2019.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE

15